should I begin, your honor? Yes, please. May it please the court. I'm Bradley O'Connell representing Jose Luna. I'd like to focus my remarks on the Miranda issue and offer the court two very simple propositions which I think should guide this court's determination of whether this was an unreasonable application. The first of these is that a Miranda waiver or invocation question must be analyzed under the totality of circumstances, which requires considering the interrogation in context. And the second is that, subject always to that rule of considering in context, we should accord words their ordinary English meanings. Taking those two propositions together, applying them to Detective Friese's interrogation of Mr. Luna, I think the conclusion is inescapable that there was never a valid waiver of the right to counsel and that, considering the several references to a lawyer collectively, Mr. Luna's responses should have put any reasonable officer on notice that he was seeking to avail himself of that right. But there are two separate questions in there. At least I think you're telling me that. One of them, did he waive? And the other one is, did he invoke the right to counsel? That is correct. I view those as essentially the flip sides of the coin. And I believe this case stands in vivid contrast to the circumstances of Davis v. U.S. In Davis, you initially had an explicit oral and written waiver of both the rights to silence and the right to counsel. Approximately an hour and a half into the interrogation, the sailor under investigation made the famous remark, maybe I should get a lawyer. The naval investigators followed up, and he immediately clarified, no, I don't want a lawyer. Now, in contrast here, we have nothing remotely approximating an explicit waiver of counsel. We have that initial statement about probably should get a lawyer. Probably. Probably and maybe are at opposite ends of the continuum in terms of certitude. Can I ask you this? I read the California Court of Appeal decision on this. Yes. And it spends a lot of time talking about whether he invoked the right to counsel. Yes, Your Honor. In your view, did the California Court of Appeal discuss or rule on the question of waiver? It did not explicitly rule. It initially, early in its opinion, it phrased, it said there's an issue of whether there's been a Miranda Wraver. But then it proceeded to analyze the matter solely in terms of Davis and never really analyzed whether viewing especially the earlier part of the interrogation in context, there was ever a waiver. There certainly is never an occasion in contrast to such cases as Davis. And I submit in contrast really almost every one of the authorities cited by the state. There was nothing approximating a written or oral waiver of rights such as we ordinarily see these days in Miranda cases. You speak of being two sides of the same coin. Yes, Your Honor. I wonder if that's really a good explanation because as I understand your argument, waiver, the government has the burden. That's correct. Whereas in vocation, the client has the burden. That is absolutely true, Your Honor. So they're really quite different. In that respect, they certainly are. And that just makes all the more painfully apparent. Reading this interrogation, which is, I have to say, is remarkably effective on the detective's part and remarkably inarticulate on the defendant's part as this, frankly, is the most effective use of a nice cop interrogation tactic of any interrogation I have looked at, all of which and also making, of course, quite effective use of deception, since what wears the defendant down is her repeated and patently false statements, we have recovered your DNA. Not only did she allege that they'd recovered his DNA inside the victim, but she also said, not only that, we can tell by dating the cells that it was on more than one occasion. And it was only then, after initially, even in the face of the DNA falsehoods, continued to say, I don't remember anything like that, that toward the very end of the interrogation, he basically gave up the ghost and said, I know it happened and happened more than once. Yes. Which was extremely late in the interview. And even then, it seems to me he's saying it in context. Well, I mean, if you say that you found my DNA inside of her vagina, and if you tell me that, as you've told me, that just putting my hand on your knee or you're putting your hand on my knee, leaves DNA from the cells that flake off. Well, I was asleep. I was drunk. Well, it must have happened. That is exactly. That is exactly. That's the sequence of the interrogation. The only conduct that he admits an awareness of is what he claims was a single incident when he was asleep in his room and she customarily, according to him, would come into his room when he was in the morning and he'd say, get out. What? He'd say, get out after she rubbed his chest and did a few things. Well, on one instance. In one instance, he awoke and claimed that by his account, she was fondling him. As he woke up. Yes, that is right. But in the face, the detective repeatedly was pressing him, of course, on what we call the digital penetrations, armed with another falsehood, which is, well, if you had sex with her, that's one thing. But if it's just a digital penetration, it's another, ignoring the fact that actually California sentencing law treats the two as identical. But with even with all that, he was still saying, I don't remember anything like that. But if you would say my cells are in there, it must have happened. I think it is quite appropriate in for this court in analyzing both the waiver questions and the invocation questions to bear in mind that we have woven through this substantive interrogation, these repeated references to counsel. The first one, of course, is probably should get a lawyer. And Miriam Webster, which I think is a pretty reliable guide to usual English meaning, defines probably as synonymous with doubtless. The very, very opposite. I've never heard that way. Probably is a conditional type statement. I probably should do this isn't the same thing as there's no question whatsoever I should do this. Well, Your Honor, I heard the word. So I was with you until you said that. Well, it is actually in the Miriam Webster online, which I quoted trust on the Internet. Who can you trust? It is actually the first synonym of three, which they mentioned. The Miriam Webster mentions doubtless, likely, presumably all of which I submit even even the weakest of those likely is far, far removed from maybe, which is really about the most equivocal qualifier we have in the English language. But of course, we have more than probably. We have more than probably. We have the fact that in contrast to a case like Davis, where this is occurring an hour and a half after an explicit written and oral waivers, this I should probably talk to a lawyer is really has to do double duty here. Or it is regardless of whether it is would qualify as an invocation. Yeah, but my problem with that one is not just with your definition of probably there are two invocations of lawyers really that are that are pretty distinct invocation of lawyers. The first one comes very early on. He says, what if I'm getting stuck with something that I don't know about and I should probably get a lawyer, I guess. She responds, if you want a lawyer and you don't want to talk to me, then that's fine. That is to say, she's saying very clearly, well, listen, if you want a lawyer, tell me only later when he says. No, are you my lawyer? No, I'm not your lawyer. Well, it sounds the way it's going. It sounds like I need a lawyer. I help because you're saying I could get charged with rape. Well, at that point, she doesn't say, well, if you want a lawyer, tell me and I'll stop. That second one seems to be much stronger. But the first one, because of her response, seems to be weak if you're arguing not waiver, but rather invocation of right to counsel. I mean, there's my problem with your I would agree as far as the relative strengths of them in terms of invocation. If, however, one approaches this from a waiver context, all you have to stand in for a waiver is the fact that he continues with the interrogation. Although even then, every few minutes he pops up with three pages, three minutes or so further into the interrogation. We can talk. It looks like I've got nothing else to do. In other words, I'll wait until I get booked, wait until I'm charged or whatever, you know whatever, or get a lawyer. We have then after a somewhat longer gap, going turning now to page 78, about five or six minutes, still falling short of a waiver on the contrary. So I don't understand if I need to get a lawyer because I don't know. Pretty hard to say that there has been a waiver of his right to counsel. He had previously said, yeah, we can talk, after she'd given very clear instructions to him. Indeed, that followed hot on the heels of what Judge Fletcher read before. And he's going back and forth and is not clear and so forth and finally says, yeah, we can talk. Almost, but he continues even after that, Your Honor, to reiterate the concept of having a lawyer. I'd also like to, and since it's something that Judge Fletcher mentioned, which I think is very relevant to the court, my position, as I think is clear in the briefs, is this, because there was no waiver, this entire interrogation is tainted. But in the event the court were to disagree with me as to the earlier phrases of the interrogation and were to say there was no violation until what in the district court opinion is called the subsequent statement, that it sounds like I need a lawyer and I need help, in the event the court were to place the moment of the violation at that point and allow and say that the earlier parts of the interrogation could come in, most of this case would still have to fall for the reasons we were discussing a few moments ago regarding the progress of the interrogation. Most of the damaging admissions come out after that second invocation. That is absolutely right, Your Honor, because really the only thing he's admitted to, as opposed to his bewilderment in the face of the detective's DNA insertions, the only thing he's admitted to is this incident in which she supposedly is fondling him while he's essentially in the middle of the act. Even assuming that that inculpates him as to one lewd act conviction, because as the court knows, there are really three species of convictions here. There are five digital penetrations, there is one oral copulation, and there are ten of the generic lewd acts which can involve any sort of touching. I submit that were the court to find that there was no, that the earlier parts of the interrogation were all right, but that the Miranda violation didn't occur until the I need a lawyer and I need help. I submit that under Brecht, the only one of these convictions that can make it through as harmless error is a single 288 lewd act count and that all the remaining counts must be reversed. Okay, let's hear from the government. We've let you run over, but given the nature of this case, that was on purpose. Thank you, your honor. May it please the court, Jill Thayer for respondent. The California Court of Appeal applying Davis versus the United States determined that petitioner's statement, I should probably get a lawyer, I guess, was not an unambiguous expression of a desire for counsel, the required cessation of questioning. Davis is the clearly established federal law as determined by the United States Supreme Court. Was there a waiver? Yes, there was a waiver. The petitioner did say afterwards, she said if you want a lawyer and you don't want to talk to me, that's fine. Then he started talking about booking and other what's going to happen to me, things like that. Then she says, do you want to talk to me? That's, I have, that's about five minutes after the and I should probably get a lawyer, I guess, when I listen to the tape. Yeah, we can talk. I'll just wait till I get booked, you know, or whatever, get a lawyer. And I would like to point out also the California Court of Appeal did address the or get a lawyer and it determined that that was mulling over his options. And so both of those issues are properly never had this happen to me before. I don't know what to do. Is that a waiver? Well, the yeah, we can talk is a waiver. And then after at about on page 71 of the ER, if you listen to the tape, she says, you're you've been okay, I'll wait, you know, or whatever, get a lawyer. Okay, you've been charged for molesting Shannon. And then she waits. She waits for quite a while on the tape. And that's why he interrupts her and says, go ahead and ask me the questions. That's a waiver. That's a clear, voluntary, knowing waiver. He's been read his rights. How long did she wait? I read I listened to the tape, but I don't recollect the wait. I did. I didn't count the number of seconds. I just noted there was a long pause, because she kind of wanted it to sink in. These are the charges. You know, I may want to listen to that tape again, but I don't recollect the pause. There is a pause. There's a long pause. And that's why he says, go ahead and ask me the questions. Because she's kind of like, okay, this is what you've been charged with. Yeah, go ahead and ask me the questions. It's hard to parse these things. Sometimes, go ahead and ask me the questions doesn't necessarily say, I'm ready to answer the questions. But it's encouraging the interrogation to continue. I'm willing to talk, go ahead and ask me the questions. Maybe then he could say, once I hear your questions, I don't want to talk to you. Let me back off from the fine grain. We have to get back into it, because there's no question, but that's really where much of this case lies. But let me back off from it for just a minute and tell you what's mostly troublesome about this case. We've got somewhat equivocal evidence, even in the so-called confession. We have the prosecutor himself, even during closing arguments, saying that the detective came to him and said she didn't think there was enough evidence here even to make the case. And at worst, what we have is digital penetration and perhaps one oral copulation. And we've got somebody in jail for 170 years. There's something that strikes me as disproportionate here. Well, the jury had all the evidence before it. It had Shannon's testimony. I mean, the statements that he made, the admissions he made in his interview, it was all her. She came into my room and fondled me. That's what he's saying. The family's not wound tight. There's something wrong with that family. It's quite clear that the jury believes her story and believes what's in the confession. And if this were a conviction that had sent him away for 10 years, you know, that's just what happens. 170 years seems to me a fairly long time. That's the state of a California's sentencing rules. And we may or may not get to the oral argument, because we might be able to handle that simply on the briefs. But there may also be, of course, a sentencing problem in this case, too. And that was never raised either. I mean, the only sentencing issue is the apprendee issue, which I can get to in a moment. It seems along that line, it seems like a strange invocation of prosecutorial discretion and also of consecutive sentencing to arrive at that for this, in comparison to the things we hear where the person who was charged was a stepfather and had control and all that. Here's a guy that didn't have any particular control at all, and here he's 170 years. I think that was with the finding that he was pulling her out of the room. It's the bat. But even according to his and her testimony, he wasn't pulling her out of the room against her will. I don't want to say that if you take the story that the jury believed, this is an innocent person who does not deserve punishment. Do not mistake me. I'm not saying that. But this is far from a violent rape. We see cases that are much worse than this all the time coming up through the California courts, in which the sentences are much lower than this. This is an outrider. It is a long sentence. It is a long sentence. But that's never been raised below. Well, those were the apprentice stuff. But frankly, the apprentice stuff, he's already getting 90 years to life without the apprentice issue at all. So the math is, if I win on that apprentice issue, it's 170 years to life. If I lose, which I shouldn't because apprentice has nothing to do with consecutive sentencing, and the United States Supreme Court has never held, certainly not by the time of this case, that it applies to consecutive sentencing. But in any event, it's still, it's 116 years to life. And that's why the Court of Appeals said, well, the apprentice issue has little practical consequence. Let's get back into the fine grain. I apologize for taking so much time on this issue. But I did want to register with you one of the things that's bothering me about this case. Thank you. It applies pressure to parts of the law where the pressure shouldn't be applied, because the issues that are in front of us really aren't those issues, and yet it's a shadow over the case. And you can't do anything about it now, but we'd all be better served if the law weren't pushed in the direction that it forces us to go. Editorial observation, but it does cast a shadow over this case. There's no way around that. Well, back to the issue of the- So let me ask a fine grain question. There are two pieces to this Miranda question. One of them is, is there a waiver? And the other is, is there an affirmative invocation of right to counsel? Did the California Court of Appeal rule on the question of waiver? No. It was never asked to rule on the question of waiver. Well, it was asked about Miranda, and Miranda basically has the two questions there. Is this an exhaustion question you're raising? This is an exhaustion question and a cognizability question, because the issue of waiver- Fairly easy to satisfy. Basically, all you've got to do is cite Miranda, and that's exhaustion. It may be that for purposes of raising the argument within the California court, in terms of their own little rules about, well, you didn't raise it in the way we want it, that may be a different question. But in terms of exhaustion, once you say Miranda, it's fairly raised, in my view. The word waiver was never raised until the Certificate of Appealability. Okay, the District Court didn't consider the waiver issue. I have a question on the very clever examination by this detective. She is really good, I'll say that. But at this point, which was early in it, very, very shortly after that initial statement, she says, do you understand the rights that I just read you? And Luna says, now does that hurt me in any way? I mean, because look it, you're writing things down already about my family. And she said, just about you, I'm just writing about you. It's always been best to cooperate, she says. Well, he's kind of of the opinion that this is going to hurt him maybe, but she's saying, no, no, it really isn't. I'm just writing stuff about your family. It's not going to hurt you. I know there's, Detective Friest does an excellent job of being sweet and nice and calm, and she's not yelling at him. He thinks from the beginning that she's his friend. And that's all permissible. It is. On the other hand, we're not asking whether it's permissible for the detective or the interrogating police officer to act friendly. We're asking whether or not he knowingly waived his rights and did so with sufficient clarity that she can use that waiver. Under this court says you can create a favorable atmosphere for confession. But it has some influence on what he thinks he's doing and whether he's waiving. But he read, according to the U.S. Supreme Court, once the person has been read their rights and they agree in the absence of coercion and nothing she said was coercive, then that's it. That's it. It's all over. Miranda satisfied. That's your waiver. And here we not only have that, but we have, yeah, we can talk. And a few minutes later, or not a few minutes later, a few seconds later, go ahead and ask me the questions. Those are solid waivers. Even, and then I raised in my brief, I won't go on about it, but those are solid waivers on the waiver issue, even though that issue was never. Go ahead and ask me the questions. But he was, he wasn't sure what was going to be the charge against him and so forth. So go ahead. But does that mean he waives it from there on? Like for the part I just read you, he said, well, wait a minute, you're writing things down. Is this going to hurt? Well, of course it's going to hurt. Well, she didn't, she didn't say, yeah, I will. But she also said, this is anything you say will be used against you. She says, and everybody, this is for me and everybody. She says, this is, you know, this is for me and everybody in my investigation. She later explains, look, it's up to me. I have to look at, I have to get everybody's story. I got her story and it doesn't look so good for you, but it's part of my job to get everybody's story and put it together. That's my job. So she's, you know, she's not doing, she's, she's a deputy. He knows that he knows who she is. Yeah. But now that's my job to get the size of the story in any way. And she indicates it won't. This is just, I'm just writing things about you at that point. Well, he's saying you're writing stuff down at that point. She's just written down his sister's name and her maiden name and all these little details. But it is true. Writing down his sister's name doesn't hurt him at all. I mean, it's the other stuff that hurts him. Let me just go to a little bit of the Brecht analysis. I just want to clear something up. Before the subsequent statement, petitioner had page ER 83, admitted Shannon was in the room fondling him. ER 96, admitted he could have put his finger inside her vagina. 99 to 100, admitted it happened more than once and admitted he could have put his mouth on her vagina. After that, he repeats some of those things after that subsequent statement, but it was all over by then. It was all over by then. So as far as any harmless error analysis on that subsequent statement, it was harmless after that subsequent statement. He had totally given away the farm by then. What are you supposed to make of, if anything, the prosecutor's statement during closing argument that the deputy herself said she didn't think the that's for the jury to decide? Okay. Thank you. Yeah, she clearly was not happy with how things turned out. She was obviously not happy with this prosecution. She didn't know. She says in the interview, and it's honest. I think it's honest. She says, I don't know what's going to happen. I do my job, and then I hand it up, and then the rest of it happens. That's what she said. I think she thought she'd done her job too well. All right. If you have any further questions, I'm prepared to submit. All right. Let me just address a little more how the detective's very effective technique and specifically her falsehoods fit into the waiver analysis. Immediately after the colloquy, which Judge Hugg was discussing on page 69, on the following page, we're still equivocating, and about approximately two-thirds down the page on page 70, this is the detective. You know honestly, and I'm answering you honest, because I have no reason ever to lie to you about anything. I don't know if you'll be in court tomorrow. I don't know what the schedule is. No reason to lie to you. One elementary principle of waiver, whichever constitutional right we're discussing, a waiver must be knowing and voluntary. This, the proposition that she was going to level, you level with me, I'll level with you. The proposition that she was going to be forthright with him was an integral part of the colloquy which induced him to speak with her in the first place, and it was patently wrong. It was wrong in terms of what is objectively verifiable, most notably the DNA evidence, and of course, it is wrong in the entire masquerade of her coaxing out of him a supposedly sympathetic story and her ludicrous disparagement of the complainant as a tarty 12-year-old. All these tactics, but most importantly, the falsehood about the DNA evidence. When you use the false assertion that the police are going to be truthful in this process and you that is not a knowing and intelligent waiver. So you're trying to distinguish for purposes of this argument between lies told in the course of investigation, excuse me, lies told in the course of the interrogation once the right has been waived. Yes, Your Honor. And lies told in inducing to waive. Yes, and specifically the especially lie here, I will never lie to you. At that point, when the defendant, at this point, we still haven't gotten into any substantive interrogation. The whole, this whole sequence from approximately page 60, I would say to maybe about page 78. The, that entire dialogue is essentially, are we, are we going to go through this, with this interrogation? And one of her tactics is, I have no reason to lie to you. And that, I submit, vitiates the knowing and voluntary character of what is already at best an implicit acquiescence, an implicit waiver. Finally, I don't have anything, as far as the direct question, totally uncorroborated story. All you've got prior to the, what's called the subsequent statement, is the, if you say it's there, I can't disagree with you. He's still, prior to it, the only thing he's really admitted is this alleged fondling incident, which would support one section 288 conviction. So, if the court disagrees with me and finds the earlier parts of the interrogation didn't mature into a Miranda violation, nonetheless, it's that, it is the events in the five or six minutes after the subsequent statement, he just gives up. He says, I know it happened. I know it happened more than once. Whereas, when those subjects came up in the preceding, in the preceding ones, he would always qualify, I don't remember this, but you're saying it happened, I guess, you're saying you've got these cells, I guess it must have. So, unless the court has any questions about, or also, if the court has any questions about the Apprendi issue, I'd be prepared to submit. Thank you. Thank you, Your Honor. The case of Luna versus Lamarck is submitted for decision. The next case on the argument calendar is Reyes versus Duncan.
judges: Hug, Fletcher, Clifton